# EXHIBIT C

JAMS ARBITRATION
------------------------------------------------------- x
GIBSON, DUNN & CRUTCHER LLP,

                      Claimant,          Jams
                                          Arbitration No. 1425028269

   -against-

WORLD CLASS CAPITAL GROUP, LLC and
WORLD CLASS ACQUISTIONS, LLC
                      Respondents.
------------------------------------------------------- x

## CORRECTED INTERIM AWARD

**Counsel:**
Mitchell A. Karlan, Esq.
Amy R. Mayer, Esq.
Nealofar S. Panjshiri, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue, 47th Floor
New York, NY 10166
212-351-4000
Counsel for Claimant

Maryann E. Norwood, Esq.
814 Lavaca Street
Austin, TX 78701
512-420-4144
Counsel for Respondents

**Arbitrator:**
Caroline M. Antonacci, Esq.
JAMS
620 Eighth Avenue, 34th Floor
New York, NY 10018

**Place of Arbitration:** New York, New York

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the Engagement Letter Agreements and incorporated Terms of Retention, dated February 1, 2016 and July 18, 2016, and a Demand for Arbitration at JAMS by Claimant dated November 20, 2018, and having examined the submissions, proof and allegations of the parties, find, conclude and issue this INTERIM AWARD as follows:

I. <u>Introduction and Procedural Statement</u>

In this Arbitration, Claimant, Gibson Dunn & Crutcher LLP ("Gibson Dunn" or "Claimant"), advances a breach of contract claim for legal services rendered. Gibson Dunn alleges that it provided legal services to Respondents, World Class Capital Group, LLC and World Acquisitions, LLC, and their affiliates ("World Class", "WC" or "Respondents") between January 2017 and October 2017.

The claim for legal services rendered relates to two matters. "Project Lasso" was a portfolio refinancing for which unpaid work for the "Extension Matter" was performed between August 2017 and October 2017. Claimant asserts that it is owed $90,233.55 on this matter, not including interest. The second matter was a private placement matter ("PPM") involving a structured offering of preferred equity units. Unpaid work on this matter was performed between January 2017 and October 2017. Claimant asserts that it is owed $757,170.07 on this matter, not including interest.

Claimant contends that, under New York law, it is entitled to an award on its underlying breach of contract claim against Respondents of $847,412.62, plus contractual 1% interest and 9% statutory prejudgment interest. Claimant does not specify what these additional amounts are. Pursuant to the Engagement Letter Agreements and incorporated Terms of Retention and JAMS Arbitration Rules, Claimant also seeks a discretionary award of its attorneys' fees and costs for the Arbitration in the amount of $683,250.00 ($601,293.68 for legal fees and $81,956.32 for costs). Claimant argues that Respondents forced it to arbitrate in order recover payment for its services and prolonged the Arbitration with changing, baseless defenses and costly gamesmanship and obfuscation.

Respondents contend that Claimant is not entitled to any underlying legal fees and costs because no written Engagement Letter exists for the two representations at issue; that Claimant has sued the incorrect parties in this Arbitration; and that Claimant performed "inadequate, ineffective and negligent work". In the alternative, Respondents request that the billings for the two matters at issue be discounted to reflect the value of the work performed and incorporate promises made by a Gibson Dunn principal to adjust the final PPM invoice. Respondents oppose Claimant's Application for Attorneys' Fees and Costs, repeating its arguments that Claimant is procedurally barred and otherwise not entitled to recover in this Arbitration.

2

The Arbitrator held Pre-Arbitration Telephone Conferences on February 7, 2019, March 1, 2019, March 20, 2019, March 27, 2019, April 3, 2019, April 26, 2019, April 30, 2019 and May 16, 2019 and issued Procedural Orders 1-8. The Arbitrator established procedures for the Arbitration and the parties exchanged information and documentary evidence.

The Evidentiary Hearing

The Arbitration hearing was conducted on May 28, 2019, May 29, 2019, June 28, 2019 and July 16, 2019. Documents were exchanged between the parties and pre-marked before the Hearing. Claimant, Gibson Dunn, was represented by Mitchel A. Kaplan, Esq., Amy R. Mayer, Esq. and Nealofar S. Panjshiri, Esq. The World Class Respondents were represented by Maryann E. Norwood, Esq. Claimant called three witnesses: Gibson Dunn real estate partners, Jesse Sharf and Steven Klein and corporate partner, Alan Bannister. Respondents called two witnesses, World Class CEO, Nate Paul, and Chief Operating Officer and Internal Counsel, Sheena Paul. The Hearing was reported by Dawn Metera, Gregory T. Di Dinato and Stephen J. Moore.

Because witness Jesse Sharf's testimony on June 28, 2019 was not completed due to his need to make a return flight to California, the parties agreed that Mr. Sharf would provide sworn answers to written questions proffered by Respondents. At the conclusion of the presentation of evidence on July 16, 2019, the parties continued to have a dispute concerning the questions to be proffered to Mr. Sharf. A schedule was set for the redrafting of two questions and outstanding responses. The parties waived summations.

The Arbitration was then closed to the extent that all evidence had been received, but, remained open pending receipt of Mr. Sharf's written testimony, receipt of the transcript and to allow for the subsequent filing of Post-Hearing briefs. A dispute regarding one written question to witnesses Jesse Sharf necessitated a Telephone Conference with the parties on August 14, 2019, and the issuance of Procedural Order 9 on August 19, 2019.

Jesse Sharf's written testimony was submitted on August 19, 2019. On August 22, 2019, Claimant and Respondents submitted their Post-Hearing Briefs. In its Pre and Post-Hearing Briefs, Claimant sought an award for the full amount of its outstanding invoices, attorneys' fees and costs. Respondents did not seek an award for attorneys' fees or costs. Thereafter, in Procedural Order 10, dated September 5, 2019, a further briefing schedule was set so that any application for interest, attorneys' fees and costs that Claimant might choose to make could be resolved within the Final Award. Claimant filed an Application for Interest, Fees and Costs on September 19, 2019. Respondents filed an Opposition to the Application for Interest, Fees and Costs on October 2, 2019. The Hearing was then closed and submitted for final determination.

II. Facts

The following is a statement of those facts found by the Arbitrator to be true and necessary to the Award. To the extent that the recitation differs from any party's position, that is the

3

result of determinations as to credibility and relevance, burden of proof considerations, and the weight of the evidence, both oral and written.

Gibson Dunn & Crutcher LLP provided legal services pursuant to two Engagement Letter Agreements dated February 1, 2016 and July 18, 2016 and incorporating Terms of Retention. The Engagement Letters were entered into between Gibson Dunn and then-General Counsel of World Class, Linda Thong, with the approval of World Class CEO, Nate Paul. They were entered into by World Class entities, WC JC Real Estate Partners I GP, LLC and World Class Acquisitions, LLC, respectively (C-2, C-4).

Both Engagement Letters provide, inter alia, "[u]nless otherwise agreed in writing, the terms of this letter and the attached Terms of Retention will also apply to any additional matters that we may handle on behalf of WC, and any affiliate of WC for whom we also provide legal services, as to which you represent that you have the authority to bind such affiliates to the terms of this letter."

Pursuant to the July 18, 2016 Engagement Letter, World Class Acquisitions, LLC retained Gibson Dunn to provide legal services in connection with Project Lasso, a portfolio acquisition. World Class Acquisitions, LLC is one of hundreds of World Class entities and affiliates under the control of World Class CEO, Nate Paul (N. Paul Tr. 140-142).

The Project Lasso portfolio refinancing closed in September 2016. In this matter, Gibson Dunn real estate partner, Steven Klein, represented Nate Paul in his individual capacity as well as his World Class Companies (Klein Tr. 27,33). Thereafter, Gibson Dunn closed the first modification of the Project Lasso loan in April 2017. Gibson Dunn was paid promptly for its work on the refinancing, but payment for the first modification was delinquent.

In August 2017, Sheena Paul, Chief Operating Office and Internal Counsel of Respondent, World Class Capital Group, LLC, re-engaged Steven Klein to negotiate a second modification of the Project Lasso loan terms, an extension of the loan. Mr. Klein explained that while payment is not usually required until a matter is concluded, because World Class no longer had a "good payment history," Gibson Dunn insisted on a $50,000 retainer. (Klein Tr. 30-31). Significantly, this retainer, like many other World Class invoices, was paid by Respondent, World Class Capital Group, LLC, not the affiliate and signatory to the underlying Engagement Letter, World Class Acquisitions, LLC (C-16).

At the time that Sheena Paul re-engaged Steven Klein to work on the Project Lasso loan extension matter, World Class has already "passed any documented binding, executed extension" and was in default on the loan. (Klein Tr. 29-30, 35, 56). World Class was in a difficult position where the lender could accelerate the loan, foreclose and take back the World Class collateral, or exercise rights under separate guarantees. (Klein Tr. 36).

Messrs. Paul and Klein discussed and implemented Mr. Paul's strategy in their meetings and discussions with the lender and lender's counsel (Klein Tr. 37-45). Mr. Paul negotiated

4

"directly" and "vigorously" with the lender in meetings. Mr. Klein negotiated with the lender's counsel, but, was directed by Mr. Paul as to what proposal or email he could send or statements he could make to counsel (Klein Tr. 40-44). Mr. Paul's "strategy" included the retention of a non-Gibson Dunn real estate litigator, in addition to Mr. Klein, his transactional counsel. This litigator, Marc Benezra, attended meetings and functioned as a powerful reminder by Mr. Paul, that "there's an easy way, and then there's the more complicated way that this can get resolved." (Klein Tr. 37-38). After two or three meetings at which Nate Paul was "running the show", "things… spiraled downward relatively quickly." "[T]he parties [were] not seeing eye to eye on what the terms of the modification should be." (Klein Tr. 40).

Eventually, Gibson Dunn began drafting and commenting on drafts of modification agreements that were being exchanged with the lender's counsel. Mr. Klein would make comments, which he would review with Sheena and Nate Paul. At a point, Marc Benezra began to take a "larger role" in the drafting exchange. Ultimately, the Pauls stopped communicating with Gibson Dunn. Mr. Klein, "assumed that the client had decided to spend more time with Marc Benezra", but Mr. Klein was not sure, despite asking an associate to try to ascertain the status from Sheena Paul. Mr. Klein was never told by the Pauls, nor did he learn, whether the loan was restructured, whether there was a seizure of collateral, or whether litigation transpired. The Pauls never advised Gibson Dunn nor Mr. Klein that they were fired or that their legal bill would not be paid. (Klein Tr. 42-44, 49-50; S. Paul Tr. 638-641).

Gibson Dunn performed work on the Project Lasso extension matter between August 2017 and October 2017. Gibson Dunn sent World Class invoices for legal services and costs totaling $90,233.25 in a final bill on November 2, 2017 (C-112). Again, Respondents never raised an objection to the bill nor any portion of it at the time of representation (S. Paul Tr. 638-641; Klein Tr. 50; N. Paul Tr. 180). Respondents simply stopped communicating with Gibson Dunn and failed to pay for the services they received. The invoices were not paid in part or in full and that nonpayment is the subject of this dispute.

Pursuant to the July 18, 2016 Engagement Letter, Respondent World Class Capital Group, LLC affiliate, Respondent World Class Acquisitions, LLC, initially retained Gibson Dunn to provide legal services in connection with the Project Lasso matter. Thereafter, in January 2017, World Class Capital Group CEO, Nate Paul, approached Gibson Dunn to represent World Class in connection with an "additional matter". The Private Placement Matter (the "PPM"), was a structed offering of preferred equity units intended to raise capital to grow the World Class business. Sheena Paul confirmed Gibson Dunn's assessment that there was no need for a retainer or new engagement letter for the PPM matter. (C-52).

From the onset, there was significant conflict between Nate Paul, a non-attorney, and Gibson Dunn counsel on this matter. Mr. Paul had his own ideas, which often changed, and repeatedly rejected the advice of his counsel. Initially, Mr. Paul insisted on using a limited liability company as the vehicle for the offering. Seasoned Gibson Dunn corporate partner, Alan Bannister, who has extensive private placement experience and is an expert on both the Securities Act of 1933 and Exchange Act of 1934, counseled Mr. Paul otherwise. (Bannister Tr.

5

7-10). Mr. Bannister warned Mr. Paul that using a limited liability company would render the units non-transferable and negatively impact their marketability. Instead, Mr. Bannister suggested a debt structure that would not impact transferability. Mr. Paul rejected that suggestion and contended that World Class "intended for these preferred units to be non-transferable." Gibson Dunn structured the transaction, as directed, as an LLC with non-transferable units. (Bannister Tr.29-32).

Mr. Bannister also repeatedly expressed his view that, given the size of the proposed offering, World Class should retain either a placement agent or investment bank to assist. Mr. Paul rejected this suggestion. (N. Paul Tr. 329-333; Bannister Tr. 33-38, 78).

Mr. Paul then changed his mind and decided that he did want the units to be transferrable. He wanted, however, for the issuing entity to be an LLC. Gibson Dunn tax and corporate counsel tried to accommodate Mr. Paul's unique structure, but, warned that the Tax Code did not permit the transferability of units in an LLC and the structure would create commercial marketability problems. (Bannister Tr. 44-47).

Mr. Paul eventually followed Mr. Bannister's advice and retained a brokerage and investment banking firm to act as a placement agent. (Bannister Tr. 47-50; S. Paul Tr. 689). Thereafter, the structure of the proposed transaction was again changed from private placement of preferred units to the issuance of debt security. (Bannister Tr. 49-50).

Earlier in the relationship, and as a result of dissatisfaction with Gibson Dunn representation, in mid-May 2017, Sheena Paul directed Gibson Dunn to cease all work. She reached out and had telephone conferences with Jesse Sharf, co-head of the real estate department at Gibson Dunn and a member of the executive committee. (Sharf Tr. 410; S. Paul Tr. 544-546). According to Ms. Paul, she shared with Mr. Sharf that she had consulted with other tax professionals and it had been determined that Gibson Dunn had not drafted the tax provisions appropriately and "significant changes" needed to be made. Ms. Paul challenged Mr. Sharf as to whether Gibson Dunn had, "the right team in place to do this work?" Mr. Sharf responded that he wanted to understand what was going on and to make calls internally at Gibson Dunn. Thereafter, he assured Ms. Paul that Gibson Dunn, "does have the right team." Ms. Paul testified that Mr. Sharf, "told me explicitly that I should continue with the work, and that the billing would be adjusted to – reflect the incorrect work that was done. And that what I needed to focus on was getting the project done, and he was sure that we would be satisfied with the bill at the end of the matter." (S. Paul Tr. 544-546; D-3). Ms. Paul and Mr. Sharf did not agree to a specific dollar amount or percentage discount that would be applied to the final bill. (S. Paul Tr. 622).

Jesse Sharf testified and acknowledged that he and Ms. Paul had telephone conversations concerning the business relationship and billing matters. Ms. Paul, "specifically said that there – in her mind there were some problems with the services or product. I could imply from the level of dissatisfaction that would lead to termination." Mr. Sharf could not recall whether Ms. Paul solicited his opinion as to whether the Gibson Dunn, World Class

6

relationship should continue. He did recall that Ms. Paul had stated that, "she would expect to receive a discount on the bill." Contrary to Ms. Paul's testimony, Mr. Sharf recalled, "she asked if we could adjust the bill, and I said we would take a look at it at the time and, if appropriate, we would consider making adjustments." (Sharf Tr. 378-383).

Following the mid-May telephone conversations between Ms. Paul and Mr. Sharf, Ms. Paul decided to resume the engagement of Gibson Dunn. Thereafter, counsel on the PPM matter, Aaron Krawitz, stated in an email to Ms. Paul on June 6, 2017, which attached the June 2017 fee update, "This attachment does not account for the discount in our fees which I understand that Jesse spoke to you about and which we will apply once the transaction is complete." (D-4). The following day, Ms. Paul wrote to Mr. Krawitz, "Regarding your email on the PPM work, Jesse let me know that he/you all would be working on an adjustment to our billing on this matter, but has not given me any specifics. He encouraged me to continue with the project with the assurance that the former would be handled appropriately. With that in mind, it's probably best that we review once that has been determined." (D-5). Once again, in an email of July 13, 2017, which attached the July 2017 fee update, Mr. Krawitz advised Ms. Paul, "This attachment does not account for the discount in our fees which we will apply once the transaction is complete." (D-6). Both of Mr. Krawitz's emails were copied to three other Gibson Dunn counsel as well as to Nate Paul. Ms. Paul's email was copied to an additional Gibson Dunn counsel.

According to Alan Bannister, throughout the PPM relationship, "it was not uncommon… for [Gibson Dunn] to be asked to send out documents urgently, respond to questions urgently and then there was radio silence, there was no communication" from either Nate or Sheena Paul. Ultimately, the Pauls ceased communicating with Gibson Dunn in October 2017. Sometime in the fall of 2017, the project was abandoned for "business reasons," which the Pauls refused to identify in their Hearing testimony. (Bannister Tr. 51; N. Paul Tr. 335, 337-338; S. Paul Tr. 696, 698).

Upon the conclusion of the PPM representation, Jesse Sharf reviewed the billings. He "did not come to the conclusion that there were inefficiencies or to the conclusion that there was a flaw in – in the work that we performed." Gibson Dunn extended a settlement offer, which was rejected. On November 15, 2018, Gibson Dunn sent Nate Paul a final bill on the PPM matter. The bill, in the amount of $757,170.07, was for legal services and costs for the period January 2017 to October 2017 (C-114). This bill has not been paid in part or in full and that non-payment is also the subject of this dispute.

III. Discussion

Claimant asserts a breach of contract claim for legal services rendered. Respondents contend that Claimant is not entitled to any underlying legal fees and costs on either the Project Lasso extension matter or the PPM matter because no written Engagement Letter exists for these representations; that Claimant has sued the incorrect parties; and that Claimant performed inadequate, ineffective and negligent work. These claims are without merit.

7

The New York State Unified Court System, Letters of Engagement Rules, 22 NYCRR 1251, require that, "an attorney who undertakes to represent a client and enters into an arrangement for, charges or collects any fee from a client shall provide to the client a written letter of engagement before commencing the representation, or within a reasonable time thereafter." However, pursuant to 22 NYCRR 1215.2(2), the requirement of a written letter of engagement shall not apply to, "representation where the attorney's services are of the <u>same general kind as previously rendered to and paid for by the client</u>" (emphasis added).

With respect to the Project Lasso extension matter, in accordance with the July 18, 2016 Engagement Letter, Respondent, World Class Acquisitions, LLC, expressly retained Claimant, Gibson Dunn, to provide legal services in connection with the "portfolio refinancing" (Project Lasso). Gibson Dunn's services included a refinancing and two modifications to the same underlying loan. Gibson Dunn's work on the same underlying Project Lasso transaction clearly constituted services "of the same general kind as previously rendered." Thus, no new written engagement letter was necessary for the Project Lasso extension matter.

The exception to the requirement of a written letter of engagement, likewise, applies to the PPM matter. Moreover, before its engagement on the PPM matter, Gibson Dunn offered Respondents the opportunity to execute a new engagement letter. On January 24, 2017, Gibson Dunn Counsel, Aaron Krawitz, wrote to Sheena Paul, Chief Operating Officer and Internal Counsel of World Class Capital Group, LLC. Ms. Paul, a sophisticated client, is an attorney who previously worked at the prestigious New York law firm of Skadden Arps in the bankruptcy and restructuring group and project finance group (S. Paul Tr. 478). Mr. Krawitz asked Ms. Paul whether, "we can proceed with officially working on this matter." Mr. Kravitz explained, "given the multiple deals closed by World Class and Gibson together, I do not expect a need for a retainer or for a new engagement letter." Ms. Paul elected not to seek a new engagement letter. Instead, she wrote back, "Thanks Aaron. Yes, let's go ahead and start the official engagement." (C-52). The prior multiple closed financing deals and the PPM designed to grow the World Class business constitute Gibson Dunn legal services "of the same general kind as previously rendered" to World Class. Respondents' decision to decline a new engagement letter constitutes a waiver of their current claim.

Respondents' arguments concerning the lack of Engagement Letters and improper parties fail for yet additional reasons. The terms of both the February 1, 2016 and July 18, 2016 Engagement Letters and Incorporated Terms of Retention (C-2, C-4), provide that, "[u]nless otherwise agreed in writing, the terms of this letter and the attached Terms of Retention will also apply to any <u>additional matters</u> that we may handle on behalf of WC, and any <u>affiliate</u> of WC for whom we also provide legal services, as to which you represent that you have the authority to bind such affiliates to the terms of this letter" (emphasis added).

By their terms, the Engagement Letters apply to "additional matters" handled by Gibson Dunn on behalf of World Class Acquisitions, LLC (the July 18, 2016 Letter) and "any affiliate" of World Class Acquisitions, LLC. Thus, while the extension matter was merely a continuation of

8

the Project Lasso matter (which is the matter referenced in the July 18, 2016 Engagement Letter) and the PPM qualifies as an Engagement Letter exception for services "of the same general kind" (NYCRR 1215.2(2)), both matters are also "additional matters" handled by Gibson Dunn on behalf of World Class Capital Group, LLC, an "affiliate" of World Class Acquisitions, LLC.

For these many reasons, there is no merit to Respondents' contentions that Claimant is not entitled to legal fees and costs because no written Engagement Letter exists for either of the matters or that Claimant has sued the incorrect parties in this Arbitration.

Respondents' additional contention that Claimant performed inadequate, ineffective and negligent work in both matters is refuted by the record. Instead, the record reveals that Respondents, particularly Respondents' CEO, Nate Paul, consistently refused the sound advice of counsel, failed to communicate with counsel, and failed to give counsel the authority they sought to properly advocate on behalf of the Respondent entities. When counsel was unavailable due to religious observance, fully informed covering counsel was made available, as the client well-knew. Appearing without papers for a negotiation at which discussion and not drafting is anticipated, is not evidence of a lack of preparation, particularly where that same counsel spent hours preparing and discussing a strategy with the client before the meeting. In any event, none of these complaints, even if valid, rise to the level of malpractice, a claim Respondents' do not assert. Once again, Respondents' post-representation defenses do not excuse their failure to pay for legal services rendered.

The testimony of COO, Sheena Paul, concerning an adjustment to the fees in the PPM matter is, however, credited. In mid-May of 2017, Ms. Paul directed Gibson Dunn to cease work and reached out to the co-head of its real estate department, Jesse Sharf. Mr. Sharf knew that World Class was an important client and that Ms. Paul was considering terminating their relationship. While Ms. Paul and World Class were not promised a specific dollar or percentage discount, an oral promise of an adjustment was made. This promise was memorialized in an email to Gibson Dunn counsel, Aaron Krawitz, and was also ratified in writing in two emails by Mr. Krawitz which confirmed a, "<u>discount in our fees which we will apply</u> once the transaction is complete." The written ratification of the promise made constitutes a valid agreement and modification of the contract terms contained in the Engagement Letter Agreements and Terms of Retention, with respect <u>only</u> to the PPM matter.

Claimant has established that it is entitled to the full outstanding invoice in the Project Lasso extension matter of $90,233.55. Applying her authority to "grant any remedy or relief that is just and equitable and within the scope of Parties' agreement" (Rule 24 of the JAMS Comprehensive Arbitration Rules & Procedures), the Arbitrator determines that a 20% reduction from the final bill of $757,170.07 in the PPM matter would have been an appropriate good faith reduction and applies this reduction now. Thus, Claimant is entitled to $605,736.05 on the PPM matter.

Pursuant to the Engagement Letter Agreements and incorporated Terms of Retention, Gibson Dunn is entitled to "charge a late fee of 1% per month on all sums that are not paid

within 30 days of presentation of our statement" (C-2, C-4 at para. 4). In addition, New York law provides for the imposition of 9% statutory prejudgment interest. Here, the interest accrual period began when this Arbitration commenced on December 6, 2018.

Gibson Dunn has not computed either the 1% late fee amount or the 9% statutory prejudgment interest amount. Counsel for Claimant is directed to separately compute each of these amounts for the entire extension matter invoice of $90,233.55. Counsel for Claimant is further directed to separately compute each of these amounts for 80% of the PPM matter invoice of $757,179.07, the amount of $605,736.05. Claimant's calculation should be provided to the Arbitrator and Respondents 7 days following issuance of this INTERIM AWARD. Respondents may respond to the calculation within 7 days thereafter.

Based upon Respondents' bad faith refusal to pay any amount of the underlying fees and costs in either of the matters, the Arbitrator exercises her discretion, as permitted by Rule 24(f) of the JAMS Comprehensive Arbitration Rules & Procedures and not expressly prohibited by the Parties' Agreement, and allocates 80% of all JAMS Arbitration fees and Arbitration compensation and expenses to Respondents. Claimant and Respondents shall compute this amount upon receipt of this INTERIM AWARD and provide it to the Arbitrator along with the above referenced interest calculation.

No attorneys' fees or costs for the Arbitration are awarded pursuant to Rule 24(g) of the JAMS Comprehensive Arbitration Rules & Procedures as such relief is not provided for by the Parties' Agreement and Respondents' conduct in this Arbitration was not "frivolous" under applicable New York law (22 NYCRR 130-1.1).

IV. Relief Granted

By way of summary and conclusion, the undersigned Arbitrator hereby enters the following INTERIM AWARD:

1. Claimant has established its breach of contract claim and, in accordance with the Engagement Letter Agreements and incorporated Terms of Retention, entered February 1, 2016 and July 18, 2016, and final bills dated November 2, 2017 and November 15, 2018 and properly issued pursuant thereto, Respondents shall pay to Claimant $90,233.55 on the Project Lasso extension matter and $605,736.05 on the PPM matter, plus interest to be determined by the Arbitrator following submissions to be made by the Parties concerning the calculation of such interest.

2. Respondents shall pay 80% of all JAMS Arbitration fees and Arbitration compensation and expenses.

3. Claimant is not awarded any attorneys' fees or costs and expenses for the Arbitration.

4. All of Respondents' remaining defenses and affirmative defenses are denied.

5. This INTERIM AWARD is in full settlement of all claims submitted to this Arbitration. To the extent that any claim is not specifically mentioned herein, it is denied.

Dated: New York, New York
October 18, 2019

_____
Caroline M. Antonacci
Arbitrator

I affirm that this Arbitration Award is true and accurate pursuant to CPLR Section 7507.

October 18, 2019

_____
Caroline M. Antonacci

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Gibson, Dunn & Crutcher, LLP vs. World Class Capital Group, LLC, et al.
Reference No. 1425028269

I, Vickie Johnston, not a party to the within action, hereby declare that on November 21, 2019, I served the attached Corrected Interim Award on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at New York, NEW YORK, addressed as follows:

Mitchell A. Karlan Esq.
Gibson Dunn & Crutcher
200 Park Ave.
47th Floor
New York, NY  10166-0193
Phone: 212-351-4000
mkarlan@gibsondunn.com
    Parties Represented:
    Gibson Dunn & Crutcher

Maryann Norwood Esq.
Ms. Sheena Paul
World Class Global Business Services
401 Congress Avenue
33rd Floor
Austin, TX  78701
Phone: 512-962-3528
mnorwood@world-class.com
spaul@world-class.com
    Parties Represented:
    World Class Acquisitions, LLC
    World Class Capital Group, LLC

Amy Mayer Esq.
Gibson Dunn & Crutcher
200 Park Ave.
New York, NY  10166
Phone: 212-351-4000
amayer@gibsondunn.com
    Parties Represented:
    Gibson Dunn & Crutcher

I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW YORK on November 21, 2019.

_____
Vickie Johnston
VJohnston@jamsadr.com